CUPEY BAJO NURSING HOME, INC.
d/b/a Hospital Nuestra Senora De
Los Angeles, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 685–89C.

United States Court of Federal Claims.

June 24, 1996.

Fernando L. Gallardo, San Juan, Puerto Rico, attorney of record, for plaintiff.

William K. Olivier, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge.

### I. INTRODUCTION

Cupey Bajo Nursing Home, Inc., d/b/a Hospital Nuestra Senora de Los Angeles (Cupey Bajo or plaintiff), brings a government contract action against the United States (the government or defendant) pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–613 (1988 & Supp. V 1993). In its complaint, as amended,[1] Cupey Bajo claims that defendant wrongfully disallowed $35,000 in costs that plaintiff allegedly incurred performing its cost-reimbursement type contract for the Veterans Administration (VA)[2] during the period January 1, 1983 through November 22, 1983. Pl. Ex. 11A; Tr. 15.[3]

In response to Cupey Bajo's claim, defendant filed an answer, affirmative defenses, and a counterclaim on May 18, 1993, seeking recovery of $239,730, which it asserts the government overpaid Cupey Bajo under the contract during the calendar year 1983. In

short, therefore, the dispute before this court is whether, based on the terms of the contract and the applicable regulatory provisions, plaintiff was underpaid or overpaid under its cost reimbursement type contract with the VA during 1983. This court held a five-day trial to resolve the parties' dispute, commencing May 17, 1995 and concluding May 23, 1995, in San Juan, Puerto Rico.

### II. FACTS

#### A. *Background*

##### 1. *The Contract*

On April 1, 1982, defendant awarded a cost reimbursement type contract, Contract No. V455P–1531, to Cupey Bajo for the performance of hospital services, including psychiatric care, to veteran patients at its inpatient facility in Rio Pedras, Puerto Rico (the contract). The life of the contract at issue was initially scheduled for a one-year period commencing on April 1, 1982.[4] Through mutually executed contract modifications, the parties extended contract performance through to October 31, 1983.[5] Predating the Federal Acquisition Regulations, the contract terms require application of the Federal Procurement Regulations (FPR) and Medicare Manual HIM–15.

---

1. On December 20, 1989, Cupey Bajo filed its original complaint in this court pursuant to 41 U.S.C. § 609(a). Because this court found that Cupey Bajo had not properly certified its claim for $169,905 to the contracting officer (CO) prior to filing its complaint in this court, we dismissed Cupey Bajo's claim without prejudice for lack of subject matter jurisdiction. The proceedings were then stayed by the court, awaiting Cupey Bajo's proper certification and submission of its claim to the CO (on September 17, 1991). This having occurred, Cupey Bajo filed an amended complaint in this court on April 23, 1993, substantially averring that which it complained of in its original complaint filed on December 20, 1989, and requesting recovery of $169,905 under the terms of the contract.

Subsequently, during opening argument at trial on May 17, 1995, Cupey Bajo again amended its complaint, informing the court that it had discovered an inadvertent typographical error in its complaint(s). As a result, plaintiff reduced the money it claimed Cupey Bajo was underpaid under the contract from $169,000 to $35,000. *See* Transcript dated May 17, 1995, at 15. On yet another subsequent occasion, during closing

argument held on June 12, 1995, and in its post trial briefs, plaintiff attempted to amend its complaint once again to adjust its monetary claim against the government from $35,000 to $50,-983.68. *See* Transcript dated June 12, 1995, at 28. *See infra* note 19 and accompanying text.

2. The Veterans Administration is now the Department of Veterans Affairs.

3. Hereinafter, "Pl.Ex." and "Def.Ex." refer to plaintiff's exhibits and defendant's exhibits, respectively, introduced into evidence at trial. "Tr." refers to the transcript of the trial held in this case during the period May 17 through May 23, 1995.

4. Originally, the contract was issued in 1973 to provide services for VA beneficiaries.

5. Notwithstanding this fact, both plaintiff's and defendant's evidence proffered at trial without objection addressed costs allegedly incurred for performance of the contract through November 22, 1983.

### 2. *Reimbursable Costs According To A Per Diem Rate*

The payment terms of the contract directed the government to reimburse plaintiff for costs incurred in providing inpatient hospital services to VA beneficiaries based upon an "all-inclusive inpatient day cost basis", or "per diem rate." Jt.Ex. 1, ¶ 2; Pl.Ex. 1, ¶ 4(a). Cupey Bajo would receive such "per diem" reimbursement each day a veteran received inpatient care at the hospital, otherwise referred to as a "VA inpatient service day." Pl.Ex. 1, ¶ 4(b).

For the payment of contract performance costs invoiced during 1983, the contract established a provisional, or "interim", per diem rate of *$65.93.*[6] This interim per diem rate was subject to adjustment by the government based on a final determination of Cupey Bajo's actual cost of performance through audit. The contract defines plaintiff's 1983 actual, or "final," per diem rate payable for each "VA inpatient service day" performed as: (i) "the total allowable costs for hospital services" plaintiff incurred during the year, divided by (ii) the total number of *inpatient service days* plaintiff provided during the same year. Pl.Ex. 1, ¶ 4(a); Tr. 558, 560 (Davey). Total allowable expenses for purposes of calculating the "final per diem rate" exclude *outpatient* costs. *See* Pl.Ex. 1, ¶ 4(a); Tr. 421–22 (Davey). This "final per diem rate" multiplied by the actual number of "VA inpatient service days" serviced in the particular year comprised the total reimbursable cost for that year. Pl.Ex. 1, ¶ 4(a).

Approximately one year after the contract's expiration on October 31, 1983, Cupey Bajo, on October 23, 1984, reported the foregoing figures on Form JHF–001, captioned "Hospital Statement of Reimbursable Cost." [7] Pl.Ex. 2; Tr. 235 (Oyola). At that latter time, *supra,* Cupey Bajo's Hospital Administrator, Mr. Luis M. Oyola, completed the form and reported the sum of $3,188,443 as plaintiff's total inpatient costs incurred in performing the contract during 1983. Based on this sum of total inpatient costs for 1983, plaintiff claimed a "final" per diem rate of $72.95 as follows:

| | |
|---|---|
| Total inpatient costs allegedly incurred by Cupey Bajo | $3,188,443 |
| Divided by the total number of alleged inpatient service days in 1983 | 43,705 |
| Final per diem rate for actual costs incurred in 1983 | $ 72.95. |

---

This "final" per diem rate of $72.95, calculated by Cupey Bajo, for reimbursable costs during 1983 *exceeded* the contract estimate, or "provisional," per diem rate of $65.93 by *$7.02.* In other words, based on plaintiff's final per diem rate calculation, defendant allegedly underpaid plaintiff $7.02 for each of the 24,203 "VA inpatient service days" allegedly serviced during 1983. Accordingly, Cupey Bajo multiplied $7.02 by the 24,203 "VA inpatient service days" as follows:

**6.** Although the original contract indicates a provisional per diem rate of $55.53, effective January 1, 1983, the provisional per diem rate was established as $65.93 based on the Defense Contract Audit Agency's (DCAA) audit of plaintiff's 1982 accrued costs. *See* Pl.Ex. 9 at 7 (contract modification dated January 1, 1983 and signed by Cupey Bajo on June 6, 1983).

**7.** On November 7, 1994, defendant filed a motion *in limine,* seeking to exclude from trial two hospital statements of reimbursable costs completed by plaintiff: (i) Plaintiff's Hospital Statement of Reimbursable Cost dated October 23, 1984, covering the period January 1, 1983 through December 31, 1983, and (ii) Plaintiff's Hospital Statement of Reimbursable Cost dated March 14, 1983, covering the period from January 1, 1982 through December 31, 1982. During a pretrial telephonic conference, the court informed the parties that it would reserve its ruling on defendant's motion and determine the merits of the motion upon reviewing plaintiff's evidentiary foundation proffered at trial. *See* Transcript dated February 3, 1995, at 8. At trial, plaintiff introduced both items into evidence as exhibit 2 and exhibit 10, respectively. *See* Tr. 55, 60, 249, & 250. Defendant failed to object to the introduction of either item into evidence at trial, thereby waiving its right to oppose such introduction. *See* Tr. 60, 250. Therefore, said motion is hereby denied as moot.

Difference between the "final per diem rate" of $72.95 for 1983 as determined by plaintiff and the contract's 1983 provisional rate of $65.93 ......... $ 7.02

Multiplied by VA inpatient service days claimed ......... 24,203

$169,905.

---

Def.Ex. 2 at 072; Pl.Ex. 11. Therefore, Cupey Bajo averred that the VA owed it $169,905 in costs not invoiced by Cupey Bajo or paid by the government for services performed in 1983.

 After Cupey Bajo provided this statement of proposed actual costs dated October 23, 1984, to the VA, neither the VA nor Cupey Bajo acted on this matter until the spring of 1987. At that time, Mr. Oyola sent a letter to the CO on June 8, 1987, asserting that Cupey Bajo was due additional compensation of $169,905 under the contract based on the alleged difference between (i) the contract's provisional interim rate paid to the hospital; and (ii) the alleged final per diem cost rate incurred by the hospital.[8] Mr. Oyola attached a copy of his calculations made in arriving at the "final per diem rate" of $72.95, *supra*, but failed to furnish any documentation evidencing his claim that the hospital provided a total of 24,203 VA inpatient service days under the contract.

### 3. *The Audit*

In July 1987, the VA attempted to verify Cupey Bajo's claim and requested the DCAA to perform an audit of plaintiff's 1983 records as anticipated by the terms of the contract. In August and September, 1987, Ms. Maria Melendez Davey, a senior auditor for DCAA at the time, audited plaintiff's costs allegedly incurred during contract performance in 1983. The audit report states that it was "performed in accordance with generally accepted Government auditing standards ... [and] the cost principles contained in Subpart

1–15.2 of the [FPR] and Medicare Manual HIM–15." Def.Ex. 2 at 1. The results of her audit were reviewed and approved by her supervisor, Mr. Ted Traylor. The DCAA audit results reported a number of alleged deficiencies in Cupey Bajo's cost calculations. Plaintiff now challenges several of these alleged deficiencies before this court.

### B. *The Parties' Dispute*

Essentially, the parties' dispute requires this court to determine the final per diem rate reflecting the total allowable inpatient costs incurred by plaintiff in 1983 under its contract with the VA. Only then may this court find whether plaintiff was underpaid or overpaid by defendant for inpatient care at the hospital under the terms of their cost reimbursement type contract and, if either, by what amount. The court recognizes, however, that during the trial and in their post-trial briefs, the parties unequivocally agreed on several distinct factors relevant to the determination of plaintiff's 1983 final per diem rate. These factors are as follows.

First, plaintiff had initially disputed the DCAA's recommendation that the *total* number of "inpatient service days" provided by Cupey Bajo under the contract during 1983 was 47,330. In its post-trial briefing, however, plaintiff accepts defendant's assertion that the total number of inpatient service days provided by Cupey Bajo in 1983 is *47,330*, rather than 43,705. *See* Plaintiff's Post Trial Brief filed August 24, 1995, at 15.

---

**8.** In its answer filed on May 18, 1993, defendant asserted that plaintiff's claim is barred by the equitable doctrine of laches. To prove this affirmative defense, a defendant must prove that (1) plaintiff's delay in litigating its claim is unreasonable and unjustified; and (2) the delay caused defendant to suffer undue prejudice. *Nuss v. Office of Personnel Mgmt.*, 974 F.2d 1316, 1318 (Fed.Cir.1992); *Cornetta v. United States*, 851 F.2d 1372, 1377–78 (Fed.Cir.1988). At trial, however, defendant failed to present any evidence supporting these two necessary elements of proof, and, indeed, failed to even raise this issue. As a result, this court holds that defendant did not carry the burden of proving its affirmative defense of laches.

Second, plaintiff also contested the DCAA's finding that plaintiff provided 23,936 "VA inpatient service days" under the contract. This audited number of 23,936 "VA inpatient service days" reflects 267 days *less than* the 24,203 "VA inpatient service days" initially claimed by plaintiff. Plaintiff now agrees with defendant, and concedes before this court, that the appropriate number of "VA inpatient service days" provided by Cupey Bajo during 1983 is *23,936,* and *not* 24,203. *See* Plaintiff's Post Trial Brief filed August 24, 1995, at 15.

Finally, plaintiff has never contended that the government wrongfully disallowed $44,-176 of the total 1983 costs of $3,188,443 plaintiff claimed under the contract. Plaintiff concedes that the costs amounting to $44,-176.00—constituting (i) donations, $800; (ii) bad debt expense, $10,000; and (iii) penalties and fines, $33,376—are expressly *unallowable* under the terms of the FPR governing the contract.[9] Therefore, plaintiff states that the amount of $44,176 of the total costs not permitted under the FPR initially reduces the total amount of costs for the period from $3,188,443 to *$3,144,267.* Plaintiff's Post Trial Brief filed August 24, 1995, at 16 ¶ 71; *see also* Plaintiff's Reply to Defendant's Post–Trial Memorandum filed October 12, 1995, at 6.

In sum, therefore, plaintiff and defendant agree on three main factors used to determine plaintiff's final per diem rate for 1983 under the contract: (1) the total number of "inpatient service days" is *47,330;* (2) the total number of "VA inpatient service days" is *23,936;* and (3) the total 1983 inpatient services costs claimed ($3,188,443) must be initially decreased at least by expressly unallowable expenses of $44,176, resulting in total costs claimed of *$3,144,267,* a portion of which is at issue at bar.

### 1. *Plaintiff's Claim*

Notwithstanding the foregoing undisputed facts, however, plaintiff challenges defendant's disallowance of certain 1983 costs claimed by plaintiff. Specifically, the DCAA audit report of plaintiff's 1983 costs questioned $507,040 of the total $3,188,443 costs Cupey Bajo claimed. Defendant argues that, as part of the challenged $507,040 sum, outpatient expenses in the amount of $40,202 are *expressly unallowable* under paragraph 4(a) of the contract. Conversely, Cupey Bajo argues that it did *not* include any outpatient costs in its total inpatient cost pool and, therefore, the government improperly disallowed $40,202 of its costs.

In addition, plaintiff argues that specific costs it incurred in performing the contract should not have been questioned by the DCAA and disallowed by defendant. These costs now before this court consist of six (6) items as follows:

| | Disallowed Costs | |
| --- | --- | --- |
| | Not challenged by plaintiff in court | Challenged by plaintiff in court |
| (i) Rental Expenses [10] | | $ 97,800 |
| (ii) Legal & Audit Fees | | |
| (a) | $ 1,000 [11] | |

---

9. *See* 41 C.F.R. § 1–15.205–2 (bad debts expressly unallowable), 41 C.F.R. § 1–15.205–8 (donations expressly unallowable), and 41 C.F.R. § 1–15.205–13 (fines and penalties expressly unallowable).

10. *See infra* note 19 and accompanying text.

11. In addition to the $15,000 legal and audit expenses questioned by the DCAA, defendant asserts that the $1,000 plaintiff paid to Mr. Luis M. Oyola and Mr. Miguel Aran, at a sum of $500 each, is unallowable under the contract. Although the $1,000 cost was reflected in plaintiff's records in the audit and legal expense account, the costs were described in the account as "rep-

resentation costs" and were reviewed as such by the DCAA.

Here, however, plaintiff challenges the government's disallowance of only $15,000 in legal and audit costs. Similarly, with respect to the representation costs plaintiff challenges, plaintiff does not include the $1,000 paid to Mr. Oyola and Mr. Aran, but rather challenges only defendant's disallowance of the specific car allowance of $10,-857. Indeed, plaintiff did not present any evidence or argument supporting the allowability of the $500 representation expenses categorized as "legal and audit expenses" and paid to both Mr. Oyola and Mr. Aran. As a result, this court holds that plaintiff failed to carry its burden of proof

| | Disallowed Costs | |
| --- | --- | --- |
| | Not challenged by plaintiff in court | Challenged by plaintiff in court |
| | (b) | $ 15,000 |
| (iii) Management Fees | | $234,700 |
| (iv) Representation Fees | | $ 10,857 |
| (v) Interest Expenses | (a) | $ 10,000 |
| | (b) | $ 28,354 |
| (vi) Capital Expenditures | | $ 39,300 |
| Donations | $ 800 | |
| Bad Debt Expenses | $10,000 | |
| Penalties & Fines | $33,376 | |
| | $45,176 | + $436,011 |
| (vii) Questioned Outpatient Costs | | + $ 40,202 |
| | | $476,213 |
| Allowable Costs not claimed | | [$ 14,349] |
| Grand Total | $45,176 | + $461,864 = $507,040. |

---

*See* Pl.Exs. 4, 5; Def.Ex. 2 at 085–087; Tr. 174–75 (Roche). Thus, plaintiff challenges the VA's disallowance of $461,864 in costs claimed for performing the contract during 1983.

### 2. *Defendant's Counterclaim*

The government contends that the VA determined an "actual per diam rate" of *$56.65*

for 1983 under the contract by (i) employing the auditor's figures for the number of total "inpatient service days" of 47,330; (ii) using the auditor's figure for "VA inpatient service days" of 23,936, and (iii) decreasing Cupey Bajo's cost pool by $507,040.[12] Consequently, the VA made the following calculations in determining that the government had overpaid Cupey Bajo $222,126:

| | |
| --- | --- |
| Total claimed costs incurred in 1983 | $3,188,443 |
| Total questioned costs based on DCAA audit | ($ 507,040) |
| Total adjusted costs for 1983 [13] | $2,681,403 |
| Divided by total number of inpatient service days | 47,330 |
| "Actual per diem rate" for 1983 determined through DCAA audit [14] | $ 56.65 |
| Contract's provisional rate | $ 65.93 |
| Actual per diem rate for 1983 | ($ 56.65) |
| Overpayment [15] | $ 9.28 |
| Multiplied by the total number of VA inpatient service days as determined by the audit | 23,936 |
| Alleged overpayment under the contract [16] | $ 222,126. |

regarding the allowability of the $1,000 representation costs paid to Mr. Oyola and Mr. Aran (at $500 each), which was reflected in plaintiff's legal and audit account.

**12.** As a result, the "actual per diem rate" calculated according to the results of the audit reflects $9.28 less than the $65.93 provisional per diem rate originally estimated by the contract and used by Cupey Bajo for invoicing the government during 1983. In other words, the "actual" per diem rate based on the DCAA audit was $16.30

less than the $72.95 per diem rate Cupey Bajo had claimed in its post-performance statement of actual costs dated October 23, 1984. Pl.Ex. 2.

**13.** *See* Tr. 592 (Davey).

**14.** *See* Tr. 592–93.

**15.** *See* Tr. 593.

**16.** *See* Tr. 593–94; Def.Ex. 2 at 004.

In addition to the total alleged overpayment of $222,126, the VA also determined that Cupey Bajo was overpaid an additional amount of $17,604. Said amount represents an excess of 267 inpatient service days for which Cupey Bajo invoiced the government and was paid the contract's provisional rate of $65.93, and yet subsequently it was determined by the DCAA not to have been actually provided under the contract. This calculation is reflected as follows:

| | |
|---|---|
| Inpatient service days not actually provided | 267 |
| Contract provisional rate invoiced by Cupey Bajo and paid by the government | $ 65.93 |
| | |
| Overpayment for excess inpatient service days not actually provided by Cupey Bajo | $17,604. |

As a result of the foregoing, the VA informed Cupey Bajo in writing that the government had determined upon its review of the DCAA audit that Cupey Bajo had received a total overpayment of $239,730 ($222,126 + $17,604) under the contract and, accordingly, it did not owe Cupey Bajo any additional sums, including the $169,905 averred by plaintiff, under the contract.

Cupey Bajo disputed this finding to no avail during a meeting with the CO on August 10, 1988, and in a letter to the CO dated August 31, 1988. On December 21, 1988, the CO issued a final decision rejecting Cupey Bajo's claim for $169,905 under the contract and, on February 7, 1989, issued a Collection Voucher, formally requesting reimbursement of the government's $239,730 alleged overpayment under the contract. Cupey Bajo filed its original complaint on December 20, 1989, and its amended complaint on April 23, 1993.[17] In response, defendant filed its answer and counterclaim for $239,730 on May 18, 1993.

## III. DISCUSSION

### A. *The Contract*

■ The final decisions of a contracting officer regarding a government contractor's cost claims are not binding on this court. *Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed.Cir.1987); *Lathan Co., Inc. v. United States*, 20 Cl.Ct. 122, 125 (1990) (citing The Contract Disputes Act of 1978, 41 U.S.C. §§ 605(a), 609(a)(1)). Therefore, although this court reviews the facts and law decided by a contracting officer similar to other evidence before it, nonetheless, we are constrained to decide the facts and law *de novo*. *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562 (Fed.Cir.1990), *cert. denied*, 499 U.S. 919, 111 S.Ct. 1308, 113 L.Ed.2d 243 (1991). Accordingly, this court must look to the contract entered into between plaintiff and the VA, as the procuring authority, as well as the regulations governing the parties' relationship so as to determine whether the alleged contract costs are allowable. Of course, it is well established that contract interpretation is a question of law. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985). Also, "the Federal Procurement Regulations [FPR] have the force of law," *American Gen. Leasing, Inc. v. United States*, 587 F.2d 54, 57, 218 Ct.Cl. 367, 372 (1978), of which the contractor is charged with constructive knowledge. *General Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 780 (Fed.Cir.1993) ("Federal regulations which are based upon a grant of statutory authority 'have the force and effect of law, and, if they are applicable, they must be deemed terms of the contract even if not specifically set out therein, knowledge of which is charged to the contractor.' ") (quoting *De Matteo Const. Co. v. United States*, 600 F.2d 1384, 1391, 220 Ct.Cl. 579, 591 (1979)).

Here, as an initial matter, the subject contract explicitly incorporates the FPR, and provides that—

---

17. *See supra,* note 1 *and infra* note 19.

[t]he total allowable costs for hospital inpatient services shall be essentially the total expenses allowable by Medicare (as reported on SSA Form 2552) and by the provisions of Section 1–15 of the Federal Procurement Regulations [FPR] less all outpatient costs. . . .

Pl.Ex. 1 at 1, ¶ 4(a). Moreover, the contract states that "[e]xcept for [FPR § 1–15.207–17] nothing herein is understood to make allowable any of the costs which are otherwise not allowable under the provisions of [FPR, § 1–15, Part 2]." *Id.* at 2, ¶ 4(a).

Turning to the FPR provisions incorporated by reference into the contract, § 1–15.201–2 describes the "Factors affecting allowability of costs." This section provides, in part:

> Factors to be considered in determining the allowability of individual items of cost include (a) reasonableness, (b) allocability, (c) standards promulgated by the Cost Accounting Standards Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the particular circumstances, and (d) any limitations *or exclusions set forth in this Sub-part 1–15.2 or otherwise included in the contract as to the types or amounts of cost items. . . .*

41 C.F.R. § 1–15.201–2 (1982).

With these stated guidelines in mind, this court reviews the foregoing costs claimed by plaintiff seriatim to determine their allowability under the contract.[18]

### 1. *The Specific Cost Items Discussed*

As mentioned above, Cupey Bajo challenges the VA's disallowance of six (6) particular costs it allegedly incurred pursuant to its contract performance: (i) hospital rental expense ($97,800); (ii) legal and audit expenses ($15,000); (iii) management fees ($234,700); (iv) representation expenses ($10,857); (v) interest expenses ($38,354); and (vi) capital improvement expenses ($39,-300). Aggregated, these questioned *inpatient* costs are $436,011, *supra.*

#### i. *Hospital Rental Expense*

Plaintiff seeks the allowance of $97,-800 in accrued rental expense it allegedly incurred during its occupation and use of the hospital property during the first six months of the 1983 calendar year. Further, plaintiff argues that it is also entitled to the allowance of *additional* rental costs for the approximate five-month period of July 1983 through November 22, 1983 (pro rated), at a rate of approximately $16,300 per month, or a sum of $76,989. This additional rental expense allegedly increases plaintiff's total 1983 costs claimed under the contract from $3,144,267 to *$3,221,256*. As a result, plaintiff's most recent calculation of its alleged total underpayment under the contract is as follows:

| | |
|---|---:|
| Total costs claimed by Cupey Bajo for 1983 | $3,221,256 |
| Divided by the total inpatient service days actually provided by plaintiff during 1983 | 47,330 |
| Plaintiff's claimed final per diem rate for 1983 | $ 68.06 |
| The contract's provisional per diem rate for purposes of invoicing by Cupey Bajo in 1983 | ($ 65.93) |
| The difference between the provisional and final per diem rate for purposes of reimbursing Cupey Bajo for costs incurred under the contract in 1983 | $ 2.13 |
| Multiplied by the number of total VA inpatient service days provided by the hospital in 1983 | 23,936 |
| Total Underpayment Claimed By Cupey Bajo Under The Contract | $ 50,983.68 . |

---

**18.** The Cost Accounting Standards referenced in subparagraph (c) of the foregoing regulation are inapplicable to the following analysis. The audit report of plaintiff's 1983 costs prepared by the DCAA states—"Compliance with Cost Accounting Standards (CAS) was not reviewed since the contractor is exempt from CAS coverage in accordance with FPR 1–3.1203(a)(2)(iii)." Def.Ex. 2 at 001, 070, 263. The parties do not dispute this point.

Transcript dated June 12, 1995, at 27–28 (closing argument).

■ As mentioned previously, plaintiff originally filed its complaint in this court on December 20, 1989, and subsequently filed an amended complaint on April 23, 1993. Plaintiff did not express its intention to claim rental expense for the months of July through November 22, 1983, however, except briefly during cross-examination of defendant's expert witness, Ms. Davey. Tr. 674–75, 681–83; Transcript dated June 12, 1995, at 23, 27 (closing argument); Plaintiff's Post Trial Submissions filed August 24, 1995, at 16 ¶ 71, and October 12, 1995, at 6. Although this court freely grants a party leave to amend its pleadings "when justice so requires" as instructed by RCFC 15, this court has broad discretion to deny a motion to amend when it is unduly delayed. *First Interstate Bank of Billings v. United States,* 61 F.3d 876, 881–82 (Fed.Cir.1995); *Te-Moak Bands of Western Shoshone Indians of Nevada v. United States,* 948 F.2d 1258, 1260 (Fed.Cir.1991) (stating that "[n]otwithstanding the view that Fed.R.Civ.P. 15(a) is to be construed liberally, courts have not hesitated to deny motions to amend that have

been filed after significant delay."). Thus, the Federal Circuit has adopted the rule that a party seeking to amend its complaint after significant delay bears the burden of justifying the delay. *Te-Moak Bands,* 948 F.2d at 1263.

■ Here, however, plaintiff has proffered absolutely no excuse for its approximate six-year delay in claiming rental expense for the months of July 1983 through November 22, 1983. Indeed, by merely addressing the issue on cross-examination of defendant's witness, plaintiff did not actually argue this claim until closing argument on June 12, 1995. Not surprisingly, defendant opposes plaintiff's belated motion to amend its pleadings. Given that the government apparently played no role in plaintiff's extreme delay in bringing forth its claim for additional rental expense, this court cannot view plaintiff's utter failure to justify its significant six-year delay as excusable. Accordingly, this court denies plaintiff's motion to amend its pleadings to claim additional rental expense for the months of July 1983 through November 22, 1983.[19]

---

19. Notwithstanding the foregoing, even if this court were to permit plaintiff to amend its complaint with its claim for additional rental expense, this court would be required to hold that it does not have proper subject matter jurisdiction over such claim under the CDA. For this court to possess subject matter jurisdiction over plaintiff's claims pursuant to CDA §§ 605 and 609, plaintiff must have submitted a valid claim to the VA's contracting officer for a final decision. As defined in the FAR, 48 C.F.R. § 33.201 (1991), a valid claim presents—

a written demand or written assertion ... seeking, as a matter of right, the payment of money in a sum certain, ... or other relief arising under or relating to the contract. A request for payment that is not in dispute when submitted is not a claim under the Act.

In short, the claim, to be valid, must give the contracting officer sufficient notice of the amount and the basis for a decision on the contractor's claim. *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir. 1987). Moreover, if the contractor's claim exceeds $50,000, the CDA requires that the contractor certify the claim, attesting, *inter alia,* that the amount claimed "accurately reflects the contract adjustment for which the contractor believes the government is liable." 41 U.S.C. § 605(c)(1).

Although it is undisputed that plaintiff submitted a claim to the CO for rental payments allegedly incurred during the months of January through June 1983, in the amount of $97,800, this court raises the issue, *sua sponte,* concerning its jurisdiction over plaintiff's claim for the reimbursement of rental cost allegedly accrued during the months of July 1983 through November 22, 1983. *See* RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); *Booth v. United States,* 990 F.2d 617, 620 (Fed. Cir.1993) ("A party, or the court *sua sponte,* may address a challenge to subject matter jurisdiction at any time, even on appeal."); *Arctic Corner, Inc. v. United States,* 845 F.2d 999, 1000 (Fed. Cir.1988) ("A court may and should raise the question of its jurisdiction *sua sponte* at any time it appears in doubt.").

Here, this court's careful review of the record finds that plaintiff's claim for $76,989 in rental expense allegedly accrued during the latter part of 1983 was made for the very first time at trial and in its post-trial briefs. Indeed, plaintiff's total expenses claimed under the contract of $3,188,443 did not include rental expense allegedly accrued and claimed for the months of July 1983 through November 22, 1983. *See* Transcript dated June 12, 1995, at 26–27. Therefore,

Plaintiff recorded accrued rent of $97,800 in its general ledger on July 7, 1983 *as one lump sum.* The DCAA questioned plaintiff's accrued rental expense of $97,800 for the first six months of 1983, allegedly because it had no assurance that Cupey Bajo intended on actually paying the rental expense. The DCAA's recommendation was rooted in the fact that plaintiff had merely accrued, and not paid, this debt as of 1987, when the DCAA performed its audit of plaintiff's 1983 costs. Therefore, defendant's expert witness, a supervisory DCAA auditor, explained, "It would be unreasonable to reimburse the contractor for an expense which, from the records and evidence that [DCAA was] provided, it's not likely to ever be paid." Tr. 830–31 (Traylor).

In addition, defendant's expert witness, Mr. Ted Traylor, opined that contractor compliance with the cost reasonableness requirement under the FPR requires that the "contractor has a responsibility to establish whether there is, in fact, a legal obligation to make [the] rental payment before they bill the government for [the] rental payment." Tr. 843–44; *see also* Tr. 841, 845, 847. That is to say, based on generally accepted accounting principles, Mr. Traylor reasoned that if there is no liability, "[t]hen there is no incurred expense," and accordingly, there is no justification for booking an accrual. Tr. 833–34. Here, however, defendant asserts that Cupey Bajo did *not* have a liability to pay rental expense in 1983 for its use and occupancy of the hospital premises, because allegedly there was no form of agreement, express or implied, obligating plaintiff to pay rent to the owner of the hospital property in 1983. Notwithstanding this fact, defendant avers that if this court finds that the parties established an implied-in-fact lease agreement, then the government has a right to set

plaintiff's claim for $76,989 in rental expense is a separate and distinct claim from plaintiff's claim for $97,800 in rental expense allegedly accrued during the months of January through June 1983. *See Sharman Co., Inc. v. United States*, 2 F.3d 1564, 1568–69 & n. 6 (Fed.Cir.1993), *overruled on other grounds, Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1579 (Fed.Cir.1995) (holding that the definition of "claim" does not require a preexisting dispute unless the submission is a "routine request for payment."). In *Sharman*, the court held that a claim asserted under this court's CDA jurisdiction in plaintiff's original complaint served as the same claim as one raised in plaintiff's amended complaint, where the latter claim "alleges entitlement to the same money based on the same partial performance, only under a different legal label." *Id.* at 1571. Accordingly, the court determined that it possessed jurisdiction over the claim "under the actual circumstances existing at the time" plaintiff filed its complaint. *Id.* at 1569.

Similarly, in *Santa Fe Engineers, Inc. v. United States*, 818 F.2d 856 (Fed.Cir.1987), plaintiff appealed the Board of Contract Appeals dismissal of its claim for lack of jurisdiction under the CDA. There, plaintiff certified and submitted a claim to the contracting officer for a final decision and, subsequently, increased the basis and amount of the claim. *Id.* at 859–60. Specifically, before the Board, plaintiff claimed additional delay and impact costs arising from three certain, specific contract change orders. *Id.* at 859. Later, in proceedings on the merits of plaintiff's claim, plaintiff asserted additional delay and impact costs arising "from the collective nature of all the problems, changes and directives that were issued on the project." *Id.* On appeal, the Federal Circuit characterized plaintiff's change as an "addition of a claim ... entirely new [which] had never been presented to the contracting officer, or certified to him." This "new" claim addressed change orders and design difficulties *unrelated* to the original three change orders. *Id.* Consequently, because this new claim had not been certified and submitted to the contracting officer, the court held that this new claim was not properly within the Board's jurisdiction. *Id.* at 860.

Here, plaintiff's claim for additional rental expense allegedly accrued during a separate and distinct time period from that which plaintiff originally claimed in its complaint. That is to say, plaintiff's new claim for rental expense covers the performance period of June 1983 through November 22, 1983, whereas plaintiff's original claim sought entitlement to rental expense accruing from January through June, 1983. Thus, plaintiff claims additional rental expense that is clearly based on a *different* period of performance under the contract. In light of this distinction, this court cannot exercise subject matter jurisdiction over plaintiff's belated claim. *Sharman Co. v. United States*, 2 F.3d at 1568 ("Under the CDA, a final decision by the contracting officer on a claim, whether asserted by the contractor or the government, is a 'jurisdictional prerequisite' to further legal action thereon.") (citing 41 U.S.C. § 605(a) & (b)) (footnotes omitted); *see also Daff v. United States*, 78 F.3d 1566, 1571 (Fed.Cir.1996) (citing *Sharman*'s holding that a valid CO decision is a jurisdictional prerequisite under the CDA). As a result, the court's decision here is limited to a review of plaintiff's claim for reimbursement of rental expense accruing from January through June, 1983.

off the monthly rental expense owed to the government against the rental expense recovered by plaintiff.

■ Although the parties' contract does not expressly refer to the allowability of rental expense for the hospital premises, the contract terms incorporate the FPR. In this connection, the FPR allows the reimbursement of rental costs incurred in "short term leasing" real property under certain, specified conditions.[20] 41 C.F.R. § 1–15.205–34(c). A lease, as used in its ordinary meaning and defined by Webster's Dictionary, is:

> 1. A contract granting occupation or use of property during a certain period in exchange for a specified rent. 2. The term or duration of a lease. 3. Property occupied or used under the terms of a lease.

WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 683 (1984). Therefore, to determine whether plaintiff properly claims leasing costs for which the government is obligated to allow plaintiff as an appropriate cost pursuant to the parties' contract and the FPR, plaintiff *must* first establish that a lease in fact existed between plaintiff and HUD.

Prior to 1982, respecting said property, Cupey Bajo had a mortgage on the hospital property it operated under its contract with the VA. It failed to make mortgage payments on the property, however, for six or seven years prior to 1982. As a result of the foregoing, in *September of 1982*, the holder of Cupey Bajo's mortgage, Banco Popular, foreclosed against the mortgage. Foreclosure proceedings concluded September 22, 1982. Consequently, on October 1, 1982, the guarantor of plaintiff's mortgage, the United States Department of Housing and Urban Development (HUD), acquired legal title to all of the hospital's real and personal proper-

ty.[21] On November 22, 1983, Cupey Bajo relinquished possession of the hospital.

Accordingly, during the period October 1, 1982 through November 22, 1983, HUD owned the hospital property, while Cupey Bajo merely managed it pursuant to its contract with the VA. Although HUD knew of, and acquiesced in, Cupey Bajo's use, possession, and occupancy of the hospital during the period of January 1, 1983 through November 22, 1983, *both parties agree that at no time did HUD and Cupey Bajo execute an oral or written lease agreement respecting use or occupancy of the hospital.* Therefore, lacking an *express* lease agreement, plaintiff now contends that Cupey Bajo and HUD established an implied-in-fact lease agreement through their negotiations and correspondence.

■ To prove the existence of an implied-in-fact agreement, plaintiff must, of course, show an agreement " 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.' " *Hercules Inc. v. United States*, ―― U.S. ――, ――, 116 S.Ct. 981, 986, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio R. Co. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426–27, 67 L.Ed. 816 (1923)).

■ In a languid attempt to prove that an implied-in-fact lease agreement existed between the parties, plaintiff contends that when HUD sold the hospital property on November 23, 1983, HUD recouped funds in excess of the debt value of the mortgage. Specifically, in a letter to the VA dated December 21, 1988, and before this court, plaintiff argues:

> pancy (initial term plus additional terms whether or not pursuant to a renewal option) is … 5 years or less for real property.

**20.** Generally, the FPR, 41 C.F.R. § 1–15.205–34, states:

> **Rental Costs (including sale and leaseback of property).**
> (a) This [section] is applicable to the cost of renting or leasing all property, real and personal, except automatic data processing equipment (ADPE)….
> (1) "Short term leasing" means leasing where the cumulative term of the use or occu-

**21.** Plaintiff filed a motion for judicial notice on June 12, 1995, and supplemented the motion with a brief filed on July 11, 1995, in which plaintiff seeks judicial notice of the terms of HUD's public sale of the hospital in 1983. This issue is discussed *infra*.

we have paid the [$97,800] rentals and mortgage at the time we were ousted from the Hospital. At that time, we tendered Hospital property which had a market value of $5,083,700 for debts that totalled $3,924,462 plus $97,800 in rental accrued. Pl.Ex. 3 at 5; Pl.Ex. 5 at 3; *see* Tr. 122. In other words, plaintiff avers that HUD received over $400,000 in excess funds over Cupey Bajo's obligation for the hospital mortgage when HUD sold the property. As a result, although Cupey Bajo admittedly did not make any specific monetary payments for rent during January 1 through November 22, 1983, plaintiff alleges that HUD received rental payments "in kind" at Cupey Bajo's expense.[22] Plaintiff alleges, moreover, that if HUD had not received these "in kind" rental payments, HUD would have pursued Cupey Bajo for the rental payments accruing in 1983. Plaintiff admits, however, that "[t]his is, of course, an argument. There is no evidence for this." Tr. 382 (Gallardo).

Inasmuch as plaintiff asserts the foregoing as a basis establishing an implied-in-fact contract between plaintiff and HUD, this court holds that, based on all of the foregoing, the evidence in the record does not establish that through their actions, the parties had an agreement regarding a lease of the hospital premises.[23] Banco Popular foreclosed on plaintiff's mortgage property in 1982. As a result, HUD merely executed its duties as guarantor of the mortgage. Indeed, plaintiff's accountant, Mr. Roche, testified that he was *unaware* of any evidence that "would indicate that some kind of value passed from Cupey Bajo directly to HUD through foreclosure." Tr. 138–39. Thus, there is absolutely no evidentiary basis for finding an agreement between plaintiff and the government conferring on plaintiff the right to recover any value or benefit allegedly received by HUD as a result of performing its duties as guarantor of the mortgage loan. Unfortunately for plaintiff, the facts and circumstances surrounding the parties' relationship do not establish that the parties engaged in a "meeting of the minds" or "tacit understanding" to lease the hospital premis-

22. Plaintiff requests that this court take judicial notice of the terms of HUD's sale of the hospital property contained in a motion allegedly filed by the United States in a separate case, *United States v. Valcarcel*, Civil No. 89–1049 (GG) (D.P.R.). By taking judicial notice of a fact, the court may inform itself of a particular fact without resort to evidentiary proof. Judicial notice is proper, however, only if the fact(s) noticed are not subject to reasonable dispute. Fed.R.Evid. 201(b). Therefore, the fact(s) must be either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).

Upon applying the foregoing test to plaintiff's request for judicial notice, this court holds that plaintiff's motion fails to satisfy the foregoing criteria of Rule 201 and, therefore, is denied. The subject of plaintiff's motion for judicial notice are facts alleged by the United States in a post-trial motion entitled "Motion As To Additional Findings Of Fact" filed in a separate judicial proceeding. There is no indication on the subject post-trial motion or other evidence proving that the motion was actually filed in the United States District Court for the District of Puerto Rico. This court has been presented with not one scintilla of evidence that the district court presiding over *Valcarcel*, made a determination as to the validity of the facts alleged in the post-trial motion. Most significantly, however, plaintiff has not shown that the facts alleged in the motion are generally known anywhere within this court's jurisdictional boundaries. Moreover, plaintiff has not presented to this court any testimony or documentation "whose accuracy cannot reasonably be questioned," which would verify the facts stated in the subject motion. Thus, it is *not* proper pursuant to Rule 201 of the Federal Rules of Evidence for this court to take judicial notice of facts contained in the subject post-trial motion, merely because it is allegedly filed as a public document in a court, as proof of the truth of the facts asserted therein. Such facts, especially when they pertain to property transactions and valuation issues, clearly are subject to reasonable dispute. Accordingly, we are constrained to deny plaintiff's request to take judicial notice of facts that are merely alleged in a party's motion in a separate case as a basis for finding that such alleged facts are true.

Finally, and as an aside, the court notes that plaintiff failed to introduce the subject post-trial motion into evidence, *i.e.*, offer it against defendant at trial. For this reason alone, this court may not view the subject of plaintiff's request as an admission of a party opponent. Fed.R.Evid. 801(d)(2).

23. Insofar as plaintiff seeks to be allowed rental expenses by establishing that HUD was unjustly enriched through the foreclosure and ultimate sale of the hospital property, plaintiff is asserting an implied-in-law contract over which this court clearly lacks subject matter jurisdiction. *Hercules*, —— U.S. at ——, 116 S.Ct. at 985.

es or otherwise legally obligate the plaintiff to pay rental expense for the use and occupancy of the hospital premises during 1983. On the contrary, the written correspondence exchanged between the parties and disclosed in the record convinces this court that the parties did not intend or tacitly agree to lease the hospital premises.

For example, on October 28, 1982, HUD acknowledged receipt of plaintiff's "offer to purchase the Real Estate Property of the Cupey Bajo Nursing Home," but informed plaintiff's director, Dr. Murcia, that "... HUD regulations do not permit us to consider your offer." Def. Ex. 4. Shortly thereafter, HUD clarified its October 28th letter, stating:

> ... HUD cannot now accept your offer [to purchase the hospital].... Because of the interest that *you and others have shown in purchasing this project,* this office will promptly prepare a disposition program on it.
>
> Selling HUD owned projects by negotiation with defaulted mortgagors is accomplished infrequently and only in exceptional circumstances. This office cannot authorize or commit the Department to such a sale at this time.... Furthermore, we wish to point out that HUD regulations would prohibit you as former mortgagor from participating in any competitive bidding in connection with the sale of the property. There are certain exceptions to this rule which might allow your participation....

Def.Ex. 5 (emphasis added). Notably, the two foregoing letters issued by HUD to plaintiff on October 28 and December 7, 1982, merely address, in a general way, a potential sale and purchase of the hospital property; nowhere in the foregoing correspondence does HUD address a potential or actual consideration in leasing the hospital property to plaintiff.

On January 11, 1983, Cupey Bajo requested that HUD enter a negotiated sale of the hospital property or, alternatively, execute a "15 year Rental Contract with option to purchase with a monthly rental payment of $10,000.00." Def.Ex. 6 at 2. To follow up this proposal, Cupey Bajo wrote to HUD again on January 27, 1983, stating:

> As you are aware, we are in the process of negotiating with your office a one year lease agreement with option to purchase the [hospital].
>
> Our counsel, Mr. Charles Edson ... and Mr. Jose Garrido Monje, have met with your area counsel Mr. Rafael Pieras, and have discussed the lease provision which H.U.D. desires.
>
> Our counsel are preparing such lease agreement and will be submitting it to your office shortly.

Def.Ex. 7. In a responding letter dated February 2, 1983, HUD's Area Manager, Mr. Jose E. Febres–Silva, acknowledged meeting with Cupey Bajo's counsel in January 1983, but stated that—"This office has no written proposal on said offer nor have we been advised by Central Office as to their reaction to your proposal." Def.Ex. 8. HUD added, however, that it was *"considering entering into a short term leasing agreement on a month to month basis with your Corporation. As we stated to you on above referenced meeting, the consideration for the lease of our premises would be* a minimum of $16,271.69 per month. Entering into such lease agreement is also subject to approval by our Central Office." *Id.* (emphasis added). Finally, the record shows that in an undated letter written by HUD in response to plaintiff's letter dated May 31, 1983, HUD informed plaintiff that it could *not* accept plaintiff's request for a month-to-month lease. Def.Ex. 12.[24]

---

**24.** Interestingly, rather than book the alleged monthly rental costs of $16,271.69 on a monthly basis, January through July, 1983, plaintiff recorded the accrued rent of $97,800 as a single lump sum entry in its general ledger on July 7, 1983. Tr. 479 (Davey); Tr. 837 (Traylor). Rather than pass on the propriety of the accounting entry itself, this court merely notes that this evidence strongly suggests that plaintiff was not accruing monthly rental costs under an assumed month to month lease agreement as plaintiff suggests. Moreover, the court notes that plaintiff did not provide the DCAA the subject letter (Def.Ex. 12) during the DCAA's audit of plaintiff's claimed rental expenses.

It is significant to observe that plaintiff inexplicably failed to call any witnesses at trial, most notably its counsels, Mr. Charles Edson and Mr. Jose Garrido Monje, and HUD's counsel, Mr. Rafael Pieras, to provide testimony regarding the individuals' conversations and understanding regarding the alleged lease negotiations. More importantly, however, is the proof through the foregoing letters that plaintiff was clearly on notice that any lease agreement for the hospital premises would require the approval of HUD's Central Office. And yet plaintiff fails to point to any such approval or other indication that would lead Cupey Bajo into believing such approval was supplied by HUD.[25] Indeed, the foregoing correspondence clearly establishes that HUD required a written proposal from plaintiff before it would enter a lease agreement approved by the Central Office. Although the parties contemplated entering a lease agreement pertaining to the hospital property, however, the law is clear, that no contractual agreement is implied in fact where the parties merely engage in negotiations, anticipating that their agreement will ultimately be memorialized in a written document. *American Gen. Leasing,* 587 F.2d at 57–58, 218 Ct.Cl. at 373; *see also De Matteo Const. Co.,* 600 F.2d at 1388, 220 Ct.Cl. at 585–86. Thus, this court holds that, by merely anticipating a *written* agreement, the parties did not enter into an implied-in-fact agreement to lease the hospital premises.

In sum, based on the foregoing correspondence and actions of Cupey Bajo and HUD, this court cannot conclude that plaintiff and the government acquired or reached a meeting of the minds and consummated a tacit agreement to lease the hospital premises during 1983. As a result, we hold that plaintiff did *not* incur rental expense for its use and occupancy of the hospital premises in 1983 and, accordingly, has no basis for claiming such expense under the subject contract.

ii. *Legal and Audit Expenses*

Plaintiff claims that $15,000 in legal and audit expenses it incurred performing the contract in 1983 are allowable costs. Conversely, defendant argues that such expenses are not allowable under the contract because they were not paid within a reasonable time after the debts were incurred. The DCAA auditor, also defendant's expert witness, Ms. Davey, could not point to a contract provision or section of the FPR that specifically disallows the subject legal and audit fees on this record. Instead, referring to the FPR, Ms. Davey justified her recommendation to disallow the costs based on the FPR's reasonableness standard incorporating the "prudent business practice" standard.[26] Tr. 439–40. More specifically, she testified that such fees were not reasonable under the generally accepted government accounting standards and generally accepted principles of accounting [27] "because a prudent person would not charge the Government for a cost that was not paid for five years." Tr. 433–34 (Davey). Moreover, since Cupey Bajo was no longer operating an ongoing business at the time of DCAA's audit, the government argues that it would be unreasonable to expect that Cupey Bajo would ever pay such expenses.[28]

---

**25.** Indeed, plaintiff concedes that although HUD acquired legal title to the hospital property on October 1, 1982, HUD has "never made any efforts to collect" rental payments thereafter from plaintiff. Tr. 343 (Murcia).

**26.** This court notices that Ms. Davey's reference to the FPR's § 1–15.205–1 (Tr. 433) and § 1–15.205–3 (Tr. 639), entitled "Advertising costs" and "Bidding costs," respectively, for the reasonableness principle appears as a misstatement; Ms. Davey presumably meant to refer to 41 C.F.R. § 1–15.201–1 (Composition of total cost) and § 1–15.201–3 (Definition of reasonableness).

**27.** *See* 41 C.F.R. § 1–15.201–2 (instructing that if Cost Accounting Standards (CAS) do not apply to

the specific contract, a determination of allowability of costs should be guided by generally accepted accounting principles and practices). *See supra,* note 18.

**28.** Alternatively, defendant contends that Cupey Bajo waived its objection to such costs when it failed to inform the CO that the legal and audit expenses served a basis for challenging the government's contention that it overpaid plaintiff under the contract. Defendant does not cite to pertinent case law to support this alleged requirement. Cases defendant cites simply address a contractor's waiver of objection to conditions of contract performance when the contractor continues performance under such conditions. Notwithstanding the foregoing, as a factor deter-

In response, plaintiff simply states that once Cupey Bajo ceased operations in 1983, plaintiff simply has had no money available to pay the legal and audit expenses. Therefore, plaintiff claims that, under these circumstances, it is reasonable that its legal and audit costs were not paid in 1983 or prior to 1987. Plaintiff represents, however, that as of November 22, 1983, Cupey Bajo's only asset was this lawsuit and that "if collection is effected it will be paid." Plaintiff's Post Trial submissions filed August 24, 1995, at 14–15, ¶¶ 65–66.

Pursuant to the FPR, "reasonableness" is defined as follows:

A cost is reasonable if, in its nature or amount, it does not exceed that which would be incurred by an ordinarily prudent person in the conduct of competitive business. The question of the reasonableness of specific costs must be scrutinized with particular care in connection with firms or separate divisions thereof which may not be subject to effective competitive restraints. What is reasonable depends upon a variety of considerations and circumstances involving both the nature and amounts of the cost in question. In determining the reasonableness of a given cost, consideration shall be given to:

(a) Whether the cost is of a type generally recognized as ordinary and necessary for the conduct of the contractor's business or the performance of the contract;

(b) The restraints or requirements imposed by such factors as generally accepted sound business practices, arm's length bargaining, Federal and State laws and regulations, and contract terms and specifications;

(c) The action that a prudent businessman would take in the circumstances, considering his responsibilities to the owners of the business, his employees, his customers, the Government, and the public at large; and

(d) Significant deviations from the established practices of the contractor which may unjustifiably increase the contract costs.

41 C.F.R. § 1–15.201–3 (1982). In short, although the FPR does not establish a specific time frame in which an expense must be paid to be considered "reasonable," the FPR does recognize that "reasonableness" is subjectively determined on an *ad hoc* basis, in light of the relevant objective circumstances and ordinary business practice concerning the cost incurred.

In this connection, defendant does not dispute that plaintiff incurred and properly accrued the $15,000 in legal and audit fees in 1983. In fact, the DCAA auditor, Ms. Davey, admitted that plaintiff's claimed legal and audit fees were a "properly accruable item." Tr. 436, 439–40; *see also* Def.Ex. 2 at 049 (Supervisory auditor's approval of auditor's statement that the costs are allowable under 41 C.F.R. § 1–15.205–31). Therefore, from a general standpoint, defendant does not challenge the nature and amount of the legal and audit expenses plaintiff claims under the contract. It is the length of time that plaintiff has allowed to pass without paying the expense that causes defendant to now deem the expense unallowable.

Here, plaintiff admittedly did not pay the legal and audit expenses as of 1987, when the DCAA audited plaintiff's 1983 costs. Nevertheless, at no point in time did Cupey Bajo inform the DCAA that it did not intend to pay the expenses once plaintiff had the funds available. Moreover, had plaintiff paid the $15,000 in legal and audit expenses in 1984 or 1985, or even three days prior to the 1987 audit, Ms. Davey conceded in response to the court's questioning that she "would have probably allowed it" and "would not have questioned it." Tr. 632–33, 642. Similarly, the DCAA recognized in the audit report:

Of the $392,031 questioned amount, $76,-442 relates to the five year old unpaid

mining plaintiff's claim before this court, plaintiff included the $15,000 in legal and audit costs accrued in 1983 as part of its costs allegedly incurred under the contract. The DCAA audited and specifically questioned such costs. Consequently, plaintiff's total claim of $169,905 under-

payment, including the legal and audit fees, was subject to a final negative decision by the contracting officer on December 21, 1988. Under these circumstances, this court cannot find that plaintiff waived its right to dispute the disallowance of its legal and audit fees.

debts which would be allowable in the event the contractor actually pays the obligations (see Schedule A–1, Note 1.d., f., and i.). *Should the Contracting Officer allow the unpaid debts* of $38,354 interest expense, $97,800 rent, and $15,000 legal and audit fees ( [a total of] $151,154), the questioned costs would be $315,589 and the amount of overpayment to the contractor would be $145,684.

Def.Ex. 2 at 005, ¶ 2 (emphasis added). Upon reviewing the audit report, the VA agreed with this assessment, stating that the contractor's payment of the "five year old unpaid debts ... could reduce the contract overpayment" from $239,730 to $163,134. Def.Ex. 3 at 2, ¶ 3 (letter transmitted internally in the VA dated December 24, 1987). Therefore, towards the end of 1987, both the DCAA and the VA viewed plaintiff's accrued legal and audit expenses of $15,000 as unallowable simply because plaintiff had not yet paid the expense.

Notwithstanding the fact that expenses are generally paid by the contractor before they are reimbursed by the government under a cost reimbursement type contract, it is significant that Cupey Bajo ceased operations in 1983. Yet Cupey Bajo adamantly asserts that it intended and still intends to pay the $15,000 of accrued legal and audit expenses to its creditors, but has been without liquid funds to do so since 1983. This representation was not seriously challenged by defendant at trial nor controverted by the record. The DCAA's representation that plaintiff is not likely to pay the expense is mere speculation. Thus, this court holds that a lack of liquid funds due to the complete termination of operations in the year that the entity incurs the expense stands as a reasonable and valid basis for not having paid the expenses up to five years subsequently. Accordingly, plaintiff's legal and audit expenses are allowable costs under the contract.

**29.** It was established at trial that Dr. Murcia was a majority owner of both Cupey Bajo and HMG and served as president for both entities in 1983. Moreover, in 1982 and 1983, Dr. Murcia served as the Medical Director and President of the Board of Directors for *both* entities. The management agreement executed between Cupey

### iii. *Management Fees*

Plaintiff contends that defendant improperly disallowed the sum of $234,700 in management fees incurred pursuant to its management agreement (Agreement) executed on April 5, 1982, and accrued in 1983. The Agreement provided that a related, commonly-owned and managed company, Hospital Medical Group (HMG), would supply management and hospital support services during the period January 1982 through December 1985.[29] Established in 1979–80, HMG served as a 24-hour diagnostic and treatment center furnishing medical hospital services on an outpatient basis. Allegedly, the purpose of the Agreement between plaintiff and HMG was to minimize the costs of performing the contract by using physicians hired and paid by HMG.

The Agreement explicitly states that the maximum compensation plaintiff would owe HMG thereunder annually was limited to five percent of Cupey Bajo's gross income. Both Cupey Bajo and HMG maintained independent accounting records. HMG recorded the funds owed for services rendered under the Agreement as an account receivable. Cupey Bajo reflected the cost of services provided by HMG under the Agreement as an expense, and maintained records of such services by HMG through invoices prior to 1983. Accordingly, in 1983, Cupey Bajo accrued $50,000 in management fees at a rate of $10,000 per month for five months, January through May 1983. Although HMG submitted invoices to Cupey Bajo for services rendered in 1983 for a total of $50,000, Cupey Bajo has paid only $18,000 of this amount.

In the latter part of 1983, however, plaintiff did not obtain invoices from HMG reflecting the cost of services rendered during 1983, but instead relied solely on the Agreement as the pricing mechanism. As a result, although HMG did *not* invoice plaintiff for costs of services beyond $50,000 in 1983, Cupey Bajo nonetheless accrued an addition-

Bajo and HMG was signed by Dr. Murcia, on behalf of HMG, and by Mr. Oyola, on behalf of Cupey Bajo. Also, a signatory of the agreement on behalf of Cupey Bajo was Mr. Oppenheimer, who also served on the Board of Directors for HMG.

al sum of $166,700 as a lump sum closing journal entry, made at year end to maximize the management fee allowable under the Agreement, or five percent of plaintiff's 1983 gross income.[30]

Defendant disallows plaintiff's claimed management fees primarily based on the DCAA's report that plaintiff—

was unable to provide adequate documentation to enable [DCAA] to determine what services, if any, were actually provided to the hospital. Most services ... cited in the management agreement are actually performed by various departments within the hospital.... Additionally, those executives provided or hired by the management company are paid by the hospital. Therefore, in the absence of any documentary evidence of services actually provided, we questioned the total incurred costs [of $234,700 in management fees].

Tr. 491 (Davey) (quoting Def.Ex. 2 at 8, ¶ e); Def.Ex. 2 at 99. In short, the DCAA recommended disallowing plaintiff's total management fees because the DCAA believed that Cupey Bajo, and not HMG, actually performed the services delegated to HMG under the Agreement. As a result, defendant concluded that the Agreement represented merely an agreement by HMG to provide "nothing more than 'backup' or 'on-call' management services on an 'as needed basis' with an affiliated company for expenses that were grossly in excess of what a full-service management agreement would cost through competitive bidding." [31] Thus, defendant alleges that the Agreement served as "nothing but a vehicle for Cupey Bajo to bill costs to the VA for services that were never provided." [32]

To resolve whether plaintiff is properly entitled to its management fees in the amount of $234,700, this court turns to the contract terms and governing regulations.

The contract does not specifically allow or disallow management fees. Section 1–15.205–31 of the FPR, however, addresses allowability of professional and consultant service costs. It states that—

*[c]osts of professional and consultant services rendered* by persons who are members of a particular profession or possess a special skill and who are not officers or employees of the contractor *are allowable,* subject to paragraph (b), (c), (d), and (e) of this § 1–15.205–31, *when reasonable in relation to the services rendered* and when not contingent upon recovery of the costs from the government....

41 C.F.R. § 1–15.205–31(a) (emphasis added).

In turn, paragraph (b) of § 1–15.205–31 specifically delineates a list of nonexclusive factors that are relevant in determining the allowability of such costs in individual cases. Before performing a lengthy review of the factors in paragraph (b), however, this court first refers to paragraph (c), which appears to set forth more accurately the justifiable basis for the government's denial of plaintiff's claim. Paragraph (e) requires:

(e) Except for retainers (see paragraph (c) of this section [not relevant here] ), fees for services rendered shall be allowable *only when supported by evidence of the nature and scope of the services furnished.* (See also § 1–15.205–37(c) [not applicable here] ).

41 C.F.R. § 1–15.205–31(e) (emphasis added).

In connection with the foregoing, this court reviews the record to determine whether defendant correctly found that Cupey Bajo completely failed to set forth such evidence supporting its claimed accrual of $234,700 for services performed by HMG.

---

**30.** The sum of the $50,000 accrued by Cupey Bajo plus the $166,700 lump sum, however, result in total management fees allegedly owed to HMG in the amount of $216,700, rather than the $234,700 claimed by plaintiff. Instead of accounting for the $18,000 Cupey Bajo already paid HMG as *part of* the total $50,000 accrued and invoiced by HMG, plaintiff apparently is erroneously adding the $18,000 to the $50,000 plus the $166,700 to arrive at the total sum of $234,700 in management fees for 1983. *See*

Plaintiff's Brief filed August 24, 1995 at 11–12 (citing Def.Ex. 2, at 98). Plaintiff's approach effects an erroneous duplication to the extent of $18,000.

**31.** Defendant's Post–Trial Brief filed August 11, 1985, at 19 ¶ 28 (citing Tr. 859–61).

**32.** *Id.* at 33–34.

### a. Management Fees Accrued for Employee Health Care

Upon reviewing plaintiff's claim that it incurred the management fees as costs of its employee health insurance plan, this court holds that plaintiff substantially fell short of providing proof of medical plan services, as required by FPR § 1–15.205–31(e), *supra.* Although Cupey Bajo allegedly enrolled 125 of its employees and their families in a medical insurance plan in 1982, plaintiff failed to submit the medical plan documents to the DCAA, Tr. 181–82, and also failed, without proffering any form of justification, to introduce the health plan documents as evidence at trial. Indeed, plaintiff even failed to elicit descriptive testimony from available witnesses specifically identifying the terms of the HMG health plan.[33] Indeed, plaintiff's private accountant, Mr. Roche, conceded that he has no personal knowledge of the medical plan organized between plaintiff and HMG.

Plaintiff's hospital administrator, Mr. Oyola, testified at trial that HMG maintained Cupey Bajo's insurance and related records, but not its accounting, billing, patient, and collection records. Because Cupey Bajo moved to HMG's facilities upon its ouster from the hospital on November 22, 1983, plaintiff presumably had access to its records maintained by HMG. Thus, when a party has the ability to introduce available evidence to support its claim and yet fails to do so, a negative inference arises that the evidence is unfavorable to the party's claim, unless the party proffers a sufficient explanation for the omission of the evidence. *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 225–26, 59 S.Ct. 467, 473–74, 83 L.Ed. 610 (1939); *Goldberger Foods, Inc. v. United States,* 23 Cl.Ct. 295, 309 (1991), *aff'd,* 960 F.2d 155 (Fed.Cir.1992). Since plaintiff failed to provide any basis for its failure to call witnesses with knowledge of the health plan and, moreover, failed to introduce any documentation supporting its claim, this court must infer that such evidence, if presented, would have been decidedly detrimental to plaintiff's claim.

### b. Management Fees Accrued for Services Allegedly Rendered

Plaintiff contends that the parties' Agreement serves as sufficient evidence of the nature and scope of services furnished in 1983. Cupey Bajo's hospital administrator, Mr. Oyola, and plaintiff's accountant, Mr. Roche, testified at trial that the Agreement allowed Cupey Bajo access to the service of specialists and general staff members employed by HMG to cover plaintiff's absentees on a daily basis. For example, Mr. Oyola, testified that HMG provided plaintiff "specialists, laboratory work, radiology and paramedical personnel that may be required on any given day, such as during the evenings, such as weekends" to supplement insufficient personnel staffing at the hospital whenever needed.[34] Tr. 233, 259, 270. He also testified that plaintiff drew from the professional resources at HMG for managerial advice. Furthermore, he stated that throughout 1983, no employees of HMG were also employees of Cupey Bajo. HMG did not hire any regular employees for plaintiff, nor did HMG discharge any of plaintiff's employees in 1983. Mr. Oyola asserts that during 1983, plaintiff did not pay HMG for the individual service of specialists supplied by HMG, but treated the transaction as one covered by the Agreement.[35] All costs associated with the specialist services are included allegedly in the claimed $234,700.

---

33. Briefly referencing the HMG medical plan, Dr. Murcia testified that Cupey Bajo never booked the costs of the medical plan provided by HMG and never invoiced the government for such costs between 1973 and 1982, because "[i]f it had appeared in the books, the per diem that Veterans had to pay would have been much higher.... And [plaintiff] would have lost the competitive force regarding the cost with other entities." Tr. 351–52. In short, had plaintiff recognized the costs of the medical plan, its per diem rate would have been significantly higher. Tr. 369 (Murcia).

34. At trial, however, Mr. Oyola reviewed the Agreement and testified that he could not specify whether HMG performed any services in 1983 as listed in subparagraphs D and F of the agreement, except that HMG had performed building maintenance.

35. Interestingly, however, Mr. Oyola did not explain to the DCAA auditor the specific services rendered by HMG pursuant to the Agreement during the DCAA's 1983 audit.

Contradictory evidence shows that in 1983 HMG hired a financial manager and a secretary to obtain financing for Cupey Bajo at an alleged cost to HMG of $58,000, and yet Cupey Bajo, and not HMG, paid the salaries of plaintiff's financial consultants, Mr. Miguel Aran and Mr. Manuel Ortiz. More significant, with regard to the specific services HMG provided plaintiff under the Agreement, however, is the appearance in plaintiff's books, as described by the DCAA auditor, that "either there's a duplication of work, or the services are performed by the hospital rather than by HMG." Tr. 498 (Ms. Davey). That is to say, Ms. Davey testified that services provided plaintiff by its employees and reflected in plaintiff's books and records as direct charges, also appear as services provided Cupey Bajo under the Agreement and indirectly charged through the management fee of $234,700.

For example, testimony at trial supports defendant's assertion that all of the record keeping delegated to HMG under the Agreement was performed, in fact, by Cupey Bajo's employees. Moreover, plaintiff's witness testimony confirmed that the management fee includes costs associated with HMG's assumption of plaintiff's laboratory work after 3:00 p.m. in the afternoon, when plaintiff's laboratory closed. Rather than perform the laboratory work itself, however, HMG's laboratory services were actually contracted out to third parties. In addition, the evidence supports defendant's contention that personnel and accounting responsibilities delegated to HMG under the Agreement were performed by Cupey Bajo's employees. For instance, although the Agreement delegated the responsibility for hiring and paying the hospital administrator, Mr. Oyola (the hospital administrator) admitted that Cupey Bajo actually hired him and served as his employer. Furthermore, plaintiff made the following journal entries for personnel costs incurred for services in 1983—notwithstanding the fact that such services were similarly covered by the terms of the Agreement:

| | Name | Title | Accrued Cost |
|---|---|---|---|
| 1. | Manuel Ortiz | Financial Consultant | $10,348.40 |
| 2. | Felix Calderon | Employee Relations Consultant | $ 1,500.00 |
| 3. | Miguel Aran | Finance Director | $20,544.30 |
| 4. | Sigfredo Martinez | Consultant & Administrative Advisor | $ 8,500.00 |
| 5. | Francisco Murcia | Medical Director | $18,000.00 |
| 6. | Raquel Santiago | Hospital Accountant | $ 152.31 |
| 7. | Antonio Rios | Accounting Department Employee | $ 2,700.00 |

Def.Ex. 2 at 94–95; Tr. 494–98 (Davey).

In light of the foregoing nonexclusive listing of payments made by plaintiff directly to its agents, and the substantial lack of any other specific evidence, written or verbal, to evidence the services actually furnished by HMG pursuant to the Agreement during 1983, plaintiff's evidence that it utilized substantial services of HMG is obviously weak, vague, and non-probative. In contrast, defendant introduced evidence that, after Cupey Bajo left the hospital premises on November 22, 1983, HUD operated the hospital under a separate management agreement with another contractor at a cost of $5,000 per month. In light of this evidence of market rates for hospital management services, which is admittedly somewhat limited, this court recognizes that the management fee of $234,700 accrued by plaintiff for services performed by HMG, averaging approximately $21,000 per month in 1983, substantially exceeds a reasonable rate for similar management services. Moreover, the $234,700 for the accrued management fee substantially exceeds the $50,000 actually invoiced by HMG. Therefore, in light of the evidence presented at trial, or, more accurately, the lack thereof, this court holds that the *entire* management fee claimed by plaintiff in 1983 is not reasonable within the meaning of FPR § 1–15.201–3.

Against this background, therefore, this court holds that the record contains insuffi-

cient probative evidence to support plaintiff's total management fees of $234,700 claimed under the contract, as required by the provisions of the contract and the FPR, *supra.* On the other hand, by introducing invoices and testimony regarding services provided by HMG in 1983, plaintiff has sufficiently proven by a preponderance of the evidence that it is entitled to the allowance of $50,000 in management fees under the contract, and we so find and hold. Management fees claimed in the amount of $184,700 are, therefore, not allowable.

### iv. *Representation Expenses*

■ As part of its total 1983 costs claimed under the contract, Cupey Bajo seeks allowance of $10,857 in car expense payments it made to its employees, Dr. Murcia, Mr. Oyola, and Ms. Santiago. Dr. Murcia received *$8,757.02* in car allowance payments for 1983. Mr. Oyola received approximately $100 to $200 per month, or a total of *$900,* as a car allowance during 1983, from plaintiff by checks. Finally, as the third employee of Cupey Bajo to receive representation expenses, Ms. Raquel Santiago received car allowance checks in the amount of *$2,000* in 1983. These foregoing payments made to plaintiff's employees amount to a total of $11,657.02, rather than $10,857, which defendant disallowed and plaintiff challenged at trial.[36]

Defendant contends that plaintiff's total car allowance payment of $10,857 should be disallowed under the contract because plaintiff failed to provide adequate documentation substantiating the fact that these costs were actually incurred by the three individuals in their representation of the company. For instance, Cupey Bajo failed to provide any employee documentation, such as expense reports or receipts, supporting these costs. Defendant avers, moreover, that Dr. Murcia used his personally-leased vehicle for personal matters and work involving both Cupey Bajo and a second company, HMG, which he also owned and directed.[37] Dr. Murcia, how-

ever, failed to provide documentation to the DCAA showing an apportionment of his car and travel expenses between the two companies and, therefore, defendant contends that plaintiff cannot show that such expense is reasonable. Dr. Murcia did not receive a car allowance from HMG. Moreover, plaintiff failed to maintain records of Dr. Murcia's use of the company-owned vehicle and merely paid Dr. Murcia with a check in whatever amount Dr. Murcia requested. Similar to Dr. Murcia, Mr. Oyola also failed to maintain records as to when he used his car for business on behalf of Cupey Bajo as distinguished from his personal use, nor did plaintiff require him to do so.

Unrefuted testimony shows that Cupey Bajo and its employees treated the car allowance as additional compensation to the annual salary paid and received. During the DCAA's audit, Mr. Oyola informed the auditor, Ms. Davey, that the representation costs served as a fringe benefit, which compensated the employees for gasoline, car repairs, and other miscellaneous expenses associated with the employees' transportation used to carry out their responsibilities. Ms. Davey testified that she "looked at the personnel file, which confirmed what he was saying." Tr. 468. Moreover, defendant acknowledges that plaintiff paid these 1983 costs. Tr. 502 (Davey). In fact, during the audit, the DCAA reviewed the cancelled checks which evidenced the fact that the employees received the payment. In furtherance of its position, plaintiff argues that public transportation in San Juan is "not adequate" and, nonetheless, "it is not reasonable to find that the main officials of [Cupey Bajo] had to resort to public transportation to avoid the cost of their car allowances." *Id.* at 18.

Based on the foregoing facts, this court is compelled to hold that defendant erroneously disallowed reimbursement of plaintiff's representation costs in the amount of $10,857. Section 1–15.205–6(a)(1) of the FPR broadly interprets compensation for personal services

**36.** The DCAA auditor, Ms. Davey, testified at trial that her work papers erroneously indicate that Ms. Santiago's representation costs were $1,200 instead of the correct amount of $2,000. The difference of $800 accounts for the discrepancy

between plaintiff's claimed representation costs of $10,857 and the sum of the individual representation costs of $11,657.02.

**37.** *See supra,* note 27.

as including "all remuneration paid currently or accrued, in whatever form and whether paid immediately or deferred, for services rendered by employees to the contractor during the period of contract performance." [38]. Therefore, the FPR recognizes that allowable reimbursable costs include a variety of forms of compensation for personal services. Considering the breadth of the terms of this FPR section, this court holds that compensation for personal services may properly include car allowance payments. The car allowance payments served as a factor affecting salary negotiations between plaintiff and its employees upon hiring and were paid by check throughout four or five years prior to, and including, 1983. Therefore, plaintiff's claimed representation costs qualifies under the broad category of compensation for personal services as defined by the FPR. Defendant does not contend that the amount of the car allowance paid to the three employees of Cupey Bajo during 1983 is unreasonable, nor does this court view the expense as such. Accordingly, plaintiff's representation costs paid to its three employees during 1983, the actual total being $11,657.02, are allowed.

### v. *Interest Expenses*

Plaintiff also challenges defendant's disallowance of certain claimed interest expense in the amount of $38,354, consisting of two items, (i) $28,354 and (ii) $10,000, as a portion of its total costs for 1983 under the contract.

■ With respect to the first of the two items of interest expense, plaintiff claims $28,354 in interest expense in 1983, accrued on a $283,718.63 promissory note assumed by plaintiff for the purchase of the hospital property in 1970. Plaintiff guaranteed the note and later assumed the debt from Cupey Bajo's original stockholders. The note matured in 1973. Cupey Bajo did not pay any interest or principal on the note.

In 1977, the FDIC provided assistance to the deteriorating bank holding the said note,

and, in so doing, acquired the note.[39] Subsequently, the FDIC filed a complaint dated September 13, 1982, against Cupey Bajo, naming its shareholders as co-defendants, seeking collection of plaintiff's note payable of $283,718.63, plus interest of $188,305.39. Plaintiff reflected the sum of $283,718.63 as a liability on its December 31, 1982 financial statements. Nevertheless, disputing the allegations in the complaint, plaintiff has not paid the principal of the note, and has never made any interest payments towards the note, including the years 1982 and 1983.

Defendant contends that the $28,354 interest expense is not an allowable cost under the contract. It argues that the dispute reflected in the Federal Deposit Insurance Corporation's (FDIC) amended complaint filed against Cupey Bajo pertaining to the promissory note was resolved in 1982 and, therefore, whatever interest accrued on the $283,718.63 note actually accrued *before* 1983. Moreover, the DCAA questioned the interest expense because plaintiff had not made any payments on the note and, therefore, based on generally accepted accounting principles, it is allegedly not a prudent business practice to retain and continue to accrue a five-year old debt. Defendant does not contend that the interest costs were nonallocable or unreasonable.

This court, upon its review of the record, finds that the accrued interest cost was reasonably incurred in obtaining hospital premises for the performance of the services anticipated by the contract, and, moreover, is not unreasonable in its amount. Again, the DCAA recommends disallowance of this $28,-354 interest cost merely because it had not been paid by 1987. This court rejects the DCAA's recommendation, however, for the same reasons this court found that plaintiff is entitled to its legal and audit fees. That is to say, this court cannot find that plaintiff is not entitled to costs incurred under its contract with the VA merely because it terminated operations in 1983 and thereafter lacked liq-

---

**38.** An exception contained in subparagraph (f) addresses deferred compensation, not applicable here.

**39.** Plaintiff's 1982 financial statement described the $283,719 note as a "12% Note payable to

Federal Deposit Insurance Corporation. This debt was assumed by the hospital as funds were used to provide for the equity on the original acquisition of the facilities." Pl.Ex. 5 at 5, Ex. A.

uid funds to pay the expense before obtaining reimbursement from the government. Indeed, at trial, the court asked Ms. Davey whether, prior to her audit of plaintiff's 1983 costs in 1987, if Cupey Bajo had paid its obligation to the FDIC and the FDIC released Cupey Bajo, would the DCAA have questioned the interest expense as part of plaintiff's 1983 expenses. In response, Ms. Davey testified that, under such circumstances, she would not have questioned plaintiff's interest expense; she reiterated that the *only* reason she questioned plaintiff's claimed interest expense was because plaintiff had not yet paid the cost *as of 1987*. Therefore, this court holds that plaintiff is allowed $28,354.08 in interest costs reasonably incurred in performing the contract in 1983.

■ The second item of interest expense plaintiff seeks to recover under the contract, however, is a different matter. Plaintiff claims $10,000 interest cost representing "accrued interest on a mortgage held by the Banco Popular." Def.Ex. 2 at 125–26; Tr. 659 (Davey). Cupey Bajo defaulted on the mortgage note in 1973, and HUD, as the guarantor of the loan, paid the mortgage loan and took possession of the mortgage property in 1982. Defendant asserts that the $10,000 was improperly accrued by plaintiff as a 1983 expense under the contract because (1) plaintiff was not making payments on the note as of 1987 and (2) HUD, as the insurer of the first mortgage note on the hospital property, acquired the property prior to 1983, on October 1, 1982.

This court agrees with defendant. Plaintiff has not shown that the $10,000 interest expense claimed under the contract is an allowable 1983 cost. There is no evidence in the record supporting plaintiff's contention that the $10,000 interest cost was incurred as an expense in 1983 as part of its performance of the contract, after HUD had assumed ownership of the hospital property through foreclosure proceedings in 1982. As a result, plaintiff has failed to prove to this court that its $10,000 interest cost is an allowable 1983 cost.

Accordingly, plaintiff's 1983 interest expense in the amount of $28,354 is allowed.

Plaintiff's claim for $10,000 interest expense in 1983 is not allowed.

### vi. *Capital Improvement Expenses*

■ Cupey Bajo accrued capital expenditures of $39,300 in 1983, as a result of hiring an architect, Mr. Jorge Amaury Rodriguez, to perform work in 1982. The work involved preparing plans to convert the nursing home to a full general hospital facility. The hospital administrator for Cupey Bajo, Mr. Oyola, testified that the conversion of the hospital property was necessary, and demanded by the VA in 1979–80, so that plaintiff could perform the psychiatric services required under the contract. Mr. Rodriguez charged Cupey Bajo a total of $125,000 for the drawings prepared in 1982. In December 1982, Mr. Rodriguez notified plaintiff by mail that a balance remained due of approximately $45,000. Plaintiff paid Mr. Rodriguez $39,300 in 1983, and reflected the payment in its books as an expense incurred in 1983, allegedly according to generally accepted accounting principles. Cupey Bajo did not make any improvements to the nursing home facility prior to or during 1983. However, plaintiff represents that it did obtain a license as a general hospital in 1982.

The court's careful review of the record finds that the facts regarding plaintiff's claimed architectural fees are largely undisputed. It is the interpretation of the facts where the parties diverge from their harmonious acquiescence. The parties do not dispute that the VA requested plaintiff to make certain improvements to the hospital property in order for plaintiff to provide psychiatric care to VA patients, as anticipated by the contract. In addition, the parties do not dispute that the architectural fees were directly related to the hospital improvements the VA requested. Thus, through the contract, the VA served as the beneficiary of the architect's work designs intended for use in modifying the hospital premises.

Defendant questioned plaintiff's capital expenditures, however, arguing that such costs were not allowable under the contract for 1983. Initially, the DCAA questioned the architectural fees, arguing that the costs should have been capitalized by plaintiff over

a number of years, rather than charged to the contract as an expense in 1983. In other words, the architectural fees, serving as capital expenditures, should be reflected in plaintiff's books as a percentage of total costs for each year over a period of years, and the fees were not.

At trial, however, given the undisputed facts pertaining to the mortgage foreclosure and transfer of ownership of the hospital property to HUD in 1982, and assuming the absence of a leasehold relationship between HUD and Cupey Bajo, the DCAA auditors who qualified as expert witnesses, Ms. Davey and Mr. Traylor, opined that the architectural fees should have been expensed in 1982 when they were incurred, and *not* capitalized *or* expensed in 1983 when they were paid. In other words, the expert witnesses testified that under the circumstances presented in the record, indicating that plaintiff lost ownership of the hospital property in 1982, plaintiff should have terminated all capital improvements in 1982, thereby precluding it from incurring capital improvement costs in 1983.

Plaintiff's accountant, Mr. Roche, testified that Cupey Bajo was not required to expense the fees in 1982, because it did not abandon the capital improvement project until 1983. As a result, plaintiff contends that the $39,300 architectural fees paid to Mr. Rodriguez in 1983, before plaintiff abandoned the conversion project on November 22, 1983, when it was ousted from the hospital property, are allowable 1983 costs under the contract.

This court agrees with plaintiff. Although HUD assumed ownership of the hospital and provided actual notice to plaintiff of its intent to sell same in 1982, substantial evidence shows that plaintiff continued to pursue, albeit unsuccessfully, a purchase or lease of the hospital property in 1983 through negotiations with agents at HUD. Given this record as a whole, we are constrained to conclude that Cupey Bajo did not intend to abandon the premises and, in fact, was not requested or required to abandon said premises in 1982. Rather, it was only upon the ouster of Cupey

Bajo from the hospital premises on November 22, 1983, that plaintiff abandoned the hospital property. As a result of said abandonment in 1983, the capital improvement expenditure converted to an expense, and is an allowable 1983 cost under the contract.

vii. *Expenses Associated With Outpatient Care*

■ Defendant contends that plaintiff erroneously claimed $40,202 in outpatient costs as part of its total cost basis of $3,188,443 used for calculating its final per diem rate for 1983. These costs consisted of expenses associated with administration, laundry, housekeeping, utilities, maintenance, and miscellaneous services. The DCAA audit report dated September 29, 1987, at note 2, stated:

> *Costs Allocated to Outpatient Care.* Questioned costs [of $40,202] represent costs allocated to outpatient care. The contractor's accounting system does not segregate costs incurred for outpatient care. Therefore, we allocated costs on the basis of the ratio of outpatient revenues to total revenues.

Def.Ex. 2 at 9.[40] The DCAA's review and allocation of plaintiff's outpatient costs complied with paragraph 4(a) of the parties' contract, which expressly provides:

> The total allowable costs for hospital inpatient services shall be essentially the total expenses allowable ... *less all outpatient costs* as determined by multiplying the ratio of outpatient revenues over total revenues by total costs....

Pl.Ex. 1 at 1 (emphasis added). Plaintiff's challenge to DCAA's report questioning $40,202 of its total 1983 claimed expenses as improperly allocated outpatient costs merely argues that it:

> ... did not include the outpatient costs in the total amount of costs. [citing page 3 of Plaintiff's Exhibit 2 "that shows that outpatient costs are listed in a separate column."] Actually, the form provided by VA makes it impossible to include outpatient costs as part of the claim.

Plaintiff's Post Trial Reply Brief at 4, ¶ 7. It is not the form provided by the VA for the

---

40. Similarly, in a letter dated April 14, 1988, the VA informed plaintiff that—"Questioned costs allocated to outpatient care are not segregated in

your accounting system. Therefore, costs were arrived at on the basis of the ratio of outpatient care revenues to total revenues." Pl.Ex. 4 at 2.

contractor's final claim submission that is most relevant here, however. Plaintiff did not show through documentary evidence or testimonial evidence at trial that it properly excluded outpatient costs throughout its accounting procedures and, thus, from its total costs claimed, other than $103,099 in emergency care expenses. As a result, the court holds that defendant properly disallowed the outpatient costs of $40,202.

## IV. CONCLUSION

Plaintiff seeks additional payment under its contract with the VA, claiming it was underpaid its cost of performance in 1983 by approximately $35,000. Conversely, defendant contends that plaintiff was, in fact, *overpaid* during the year of 1983, and is required to refund the government $239,730. Upon a thorough review of the record and a careful consideration of the parties' arguments, the court holds that plaintiff is not due any amount of funds from defendant for its contract performance in 1983. Defendant is due, however, $167,682.03 on its counterclaim, representing an overpayment made to plaintiff in 1983. This overpayment is calculated as follows:

| | | Allowable | Not Allowable |
|--------|-------------------------------|--------------|---------------|
| (i) | Hospital Rental Expenses | | $ 97,800 |
| (ii) | Legal and Audit Expenses | $ 15,000.00 | 1,000 |
| (iii) | Management Fees | 50,000.00 | 184,700 |
| (iv) | Representation Expenses | 11,657.02 | |
| (v) | Interest Expenses | 28,354.00 | 10,000 |
| (vi) | Capital Improvement Expenses | 39,300.00 | |
| (vii) | Outpatient Costs | | 40,202 |
| | Total | $144,311.02 | $333,702 . |

Based on the foregoing disallowance of $333,702, plus the $14,349 in allowable costs plaintiff failed to claim, the total 1983 disallowed costs are *$319,353*. As a result, defendant is entitled to the following recovery on its counterclaim:

| | |
|---|---|
| Total claimed costs incurred in 1983 | $3,188,443 |
| (Less the unchallenged unallowable costs) | ( 45,176) |
| | $3,143,267 |
| Less the total unallowable costs | ( 319,353) |
| Total adjusted costs for 1983 | $2,823,914 |
| Divided by total number of inpatient service days | 47,330 |
| "Actual per diem rate" for 1983 | $ 59.66 |
| | |
| Contract's provisional rate | $ 65.93 |
| "Actual per diem rate" for 1983 | ( 59.66) |
| Overpayment per diem rate | $ 6.27 |
| Multiplied by the total number of VA inpatient service days | 23,936 |
| Overpayment under the contract | $ 150,078.72. |

In addition to the total overpayment of $150,078.72, based on the audited number of 47,330 inpatient service days provided by Cupey Bajo and the allowable reimbursable costs of $2,823,914, plaintiff was overpaid an excess of 267 (24,203 minus 23,936) inpatient service days at the contract provisional rate of $65.93. Accordingly, defendant is entitled

to a refund of an additional $17,603.31, making the total award to defendant *$167,682.03*. The Clerk shall enter judgment consistent with this opinion. No costs.

IT IS SO ORDERED.